Daly, F., J.
This is an application for an injimction to restrain the Croton Aqueduct Board from cutting off the Croton water from a large building at the corner of Frankfort and William streets, owned by the plaintiff, which is used as a cheap lodging-house.
The ordinance of the city corporation, establishing the rate of water rents, provides that hotels and boarding houses shall, in addition to the regular rate for private families, be charged for each lodging room, at the discretion of the Croton Aqueduct Board. The Board, upon the assumption that the plaintiff’s building is a hotel, have imposed an additional tax of $180 annually. The plaintiff insists that it is not a hotel, and has' refused to pay the additional tax, in consequence of which the Board have notified him that they will, if it is not paid, cut off the Croton water from the building; and the present application is to stay them from carrying that resolution into effect.
It appears that the building is a large structure of eight stories, each story' consisting of lodging rooms, adapted to the use of one person only, and above the basement it is used exclusively ás a lodging-house; that the rooms are very small, being horn four to six feet wide and eight feet long; that they are intended for poor people, being let at the small rate of twenty-five cents per night, and the water used in each room does not exceed, upon an average, a pint a day, whereas the rooms in ordinary hotels are four times as large; can be occupied by four times as many persons, and the water used in such rooms is ten times greater; that there is not a sufficient supply of Croton water above the first-floor; that four-fifths of the time it does not rise above that floor; that between seven o’clock in the morning and six in the evening there is no supply above the basement, and it could not be obtained be *28 tween these hours for the use of the floors above, unless it was carried up from the floor below, at a great expenditure of time and labor; that the water for 'the supply of the rooms and for cleaning and ordinary use, above the second-floor, is' supplied by a huge tank, which the plaintiff has caused to be erected at his own expense in the attic, into which the rain-water flows that falls upon the roof; that there is no cooking for guests, the house above the basement being adapted only for sleeping in, and not one-quarter as much water is uséd by each individual as would be "used in a private house with the same number of people; that upon an average sixty-five out of the one hundred and eighty rooms are untenanted, and yet the rate imposed by the Board is for one hundred and eighty rooms; that there is no bar or place for drinking or entertainment attached to the premises or connected with its occupation ; there is a restaurant and á barber’s shop in the basement, but each of them pays separately for the supply of Croton water which it receives.
This being the character of the building and of the uses to which it is- applied, the question presented and the only one discussed upon the motion, is whether it is a “ hotela question the solution of which depends upon the meaning 'of that term.
Ordinarily, in a legal inquiry, it is sufficient to refer to some approved lexicographer to ascertain the precise meaning of a •word. But this is a word of wide application, .and as the meaning, which is to be attached to it in this country, has been the subject of much discussion upon the argument, it may be well to refer to its origin and past history, as one of the means of determining its exact signification. The word is of French origin, being derived from hostel, and more remotely from the Latin word hospes, a word having a double signification, as it was used by the Romans both to denote a stranger who lodges- at the house of another, as well as the master 'of a house who entertains travelers or guests. Among the Bomans it was a universal custom for the wealthier classes to extend the hospitality of their house, not only to their friends and connections when they came to a city, but to respectable travelers generally. They had inns, but they were kept by slaves, and were places of resort for the lower orders,- or for *29 the accommodation of such travelers as were not in a con- ' dition to claim the hospitality of the better classes. • On either side of the spacious mansions of the wealthy patricians were smaller apartments, known as the hospitium, or place for the entertainment of strangers, and the word hospes was a term to designate the owner of such a mansion, as well as the guest whom he received. (Andrew's Lex.) This custom of the Romans prevailed in the earlier part of the middle ages. From the fifth to the ninth century traveling was difficult and dangerous. There was little security except within castles or walled towns. The principal public roads had been destroyed by centuries of continuous war, and such thoroughfares as existed were infested by roving bands, who lived exclusively by plunder.
In such a state of things there could be little traveling, and consequently the few inns to be found -were rather dens to which robbers resorted to carouse and divide then spoils than places for the entertainment of travelers. (Historie des Hotellories, Cabarets, &c., par Michel et Fournier, Paris, 1851, p. 181.) The effect of a condition of society like this was to make hospitality not only a social virtue but a religious duty, and in the monasteries, and in all the great religious establishments, provision was made for the gratuitous entertainment of way- ' farers and travelers. Either a separate building, or an apartment within the monastery, was devoted exclusively to this • purpose, which was in charge of an officer called the hostler, who received the traveler and conducted him to this apartment, which was fitted up with beds, where he was allowed to tarry for two days, and to have his meals in the refectory, while, if he journeyed upon horseback, provender was provided by the hostler for his beast in the stables. (Fosbroke’s Monachism, 238, 3d ed; Davies 2, 769.) In many countries this apartment or guest hall of a monastery retained the original Latin name of hospitium, but in France the word was - blended with hospes and .changed into hospice, and it afterward underwent another change. As civilization advanced and the nobility of France deserted their strong castles for spacious and costly residences in the towns, they erected their mansions upon a scale sufficiently extensive to enable them to discharge *30 this great duty of hospitality, as is still the custom among the nobility and wealthier classes in Eussia, and in some of the northern countries of Europe. Borrowing, by analogy, from an existing word and to distinguish it from the guest house of the monastery, every such great house or mansion was called a hostel, and by the mutation and attrition to which these words are subject in use the s was gradually dropped from the word, and it became hotel. As traveling and intercourse increased the duty upon the nobility of entertaining respectable strangers became too onerous a burden, and establishments in which this class of persons could be entertained by paying for their accommodation sprung up in the cities, towns, and upon the leading public roads, which, to distinguish them from the great mansions or hotels of the wealthy, and at the same time ■ to denote that they were superior to the auberge or cabaret, were called hotelleries, a name which has been in use in France for several centuries, and is still in use to some extent as a common term for inns of the better class, while the word hotel ■ , in France has long ceased to be confined to its original signification, and has become a word of a most extensive meaning. It is the term for the mansion of a prince, nobleman, minister of state, or of a person of distinction, or of celebrity. It is applied to a hospital, or hotel clieu, or to a town hall or hotel de ville, to the residence of a judge, to certain public offices, and to any house in which furnished apartments are let by the day, week or month. (Roquefort, Etymologique Français, Paris, 1829; Dictionnaire de ľ Academie Français, 1798, et Complement au Dictionnaire; Bescherelle, Dictionnaire Français).
The word, though so long in use in France, is of comparatively recent introduction into the English language. The Saxon word inn, was employed to denote a house where strangers or guests were entertained, down to the time of the Norman invasion, and under the Norman rule it was, in the popular tongue, the word for the town houses in which great men resided when they were in attendance on court; several of which became afterwards legal colleges, under the well known titles of inns of court. (Pearce, 50.) In all- legal proceedings, however, and wherever the Norman French was spoken, the *31 word hostel was the term, for all such establishments. The places where entertainment could be procured for a compensation, to distinguish them from the inns, or great houses, where it was furnished gratuitously, were called in English common inns; while in Norman French, by a.change analogous to that which had occurred in France, they were called first hotdleries, and afterward hostries. (Year Books, 42 E. iii., 11; 22 H. vi., 38; Statutes, 5 E. iii, c. xi.; Fitzherbert's Abm., p. 2, 28; Brooke's Abm., p. 4, 15; Dyer R., 158, a note ; Godb. R., 347; Kelham’s Norman Dicty.; Law French Dicty.,1701.) To “host,” was to put up at an inn; and “ hostler,” before referred to as the title of the officer in the monastery who was charged with the entertainment of- guests, was the Norman word for inn-keeper, and was in use until about the time of Elizabeth, when the keeping of horses at livery becoming a distinct occupation, it was the term for the keeper of a livery stable (Yelv. R., 67 ; Cooke’s Entr., 347) and afterward of the groom who has charge of the stables of an inn. (Calye’s case, 8 Co. 32 ; Bailey’s Dictionary.)
It appears from a note of Malone, referred to in' Todd’s edition of Johnson’s Dictionary, that the word hotel came into use in England by the general, introduction in London, after 1760, of the kind of establishment that was then common in Paris called an hotel garni, a large house, in which furnished apartments were let by the day, week or month. In Barclay's Dictionary, 1782; in the first edition of Walker, 1791, and in Sheridan’s Dictionary, 1795, hotel is given as the proper pronunciation of hostel, an inn; and in the dictionaries of Jones, 1798, and of Perry. 1805, it is incorporated as an English word, and is defined in the latter to be “ an inn, having elegant lodgings and accommodations for gentlemen and genteel families.” Todd, 1814, defines it to be “ a lodging-house for the-accommodation of occasional lodgers, who are supplied with apartments hired by the night or week:” The definition given by Knowles, 1835, is simply “ a lodging-house.” By Smart, 1836, “ a lodging-house or inn.” Beid, 1845, “ an inn or a lodgingrhouse.” Boag, 1848, “ an inn; and by Dr. Latham, in his edition of Johnson's Dictionary, “ an inn of -a superior kind.”
*32 The word was introduced into this country about 1797. Before that time houses for the entertainment of travelers in ■ this city were at first called inns, and afterwards taverns and " coffee-houses. In 1794 an association organized upon the principle of a tontine, erected in Wall street what was then a very superior house for the accommodation of travelers, called the Tontine Coffee-house; the success of which led to the formation of another company for the erection of one upon á still more extensive scale in Broadway. This structure, which was ■ . called the Tontine Tavern, was built about 1796, upon the site of what had been a famous tavern or coffee-house in colonial times, and from the extensive accommodation it afforded and ' the superior character of its appointments, it was then, and for many years afterward, the most celebrated establishment of the kind in the county. There was at that period a rage for everything French. The city was filled with refugees from France and.from the French West India possessions, whose residence among us produced a great change in our social habits, amusements and tastes (Watson’s Annals, 209), while a fierce party strife prevailed between those who advocated the principles of the French Bevolution and those who condemned them. The French national airs were sung in the streets, men mounted the tri-color cockade, and the proprietors of the new tavern, falling in with the popular current, gave a French name to their establishment, by changing it from the Tontine Tavern to the City Hotel. The new word was afterward adopted by the proprietors of other houses for the entertainment of travelers in this and neighboring cities, and becoming general, found its way into American dictionaries. Allison, one of the earliest of American lexicographers, 1813, defines it to be “ an' inn of a high grade, a respectable tavern.” Webster calls it “ a house for entertaining strangers or travelers,” and says that “it was formerly a house for genteel strangers or lodgers,” but that <( the name is now (1840) given to any inn.” Worcester’s definition (1846) is “ a superior lodging-house with the accommodations of an inn; a public house: a genteel innan inn,” and in the last" edition of" Webster, 1864, there is given an addition to the previous general definition: “ An inn; a public house, especially one of „some style or pretensions.” *33 It is to be deduced from the origin and history of the word and the exposition that has been-given of it by English and American lexicographers that a hotel, in this country, is what in France was known as a hotelerie, ahd in England as a "common inn of that superior class usually found in cities and large towns. A common inn is defined by Bacon to be a house for the entertainment-of travelers and passengers, in which lodging and necessaries are provided for them and for their horses and attendants. (Bac.,Abm.,Inns., B.) In Thompson v. Lacy (3 B. and A., 283), Justice Bayley declares it to be “ a house where a traveler is furnished with everything which he has occasion for while upon his way,” and, in the same case, Best, J., says it is “ a house, the owner of which holds out that he will receive all travelers and sojourners who are willing to pay a price adequate to the sort of accommodation provided, and who come in a situation in which they are fit to be received.” But a more practical idea of what was understood at the common law as common inns, may be gathered from Hollingshed’s description of them, as they existed in the days of Elizabeth. “Every man,” says that quaint chronicler, “may in England use his inn as his own house, and have for his monie how great or how little varietie of vittals and whatsoever service himself shall think fit to call for. If the traveler have a horse, his bed doth cost him nothing, but if he go on foot, he is sure to pay a pennie for the same. Each comer is sure to be in clean sheets wh'erein no man hath been lodged since they came from^the laundress or out of the water wherein they were washed. "Whether he be horseman .or footman, if. his chamber be once "appointed, he may carry the key with him¡ as of his own house as long as he lodgeth there. In all our inns we have plenty of ale, biere, and sundrie kinds of wine; and such is the capacity of some of them that they- are able to lodge two hundred or three hundred persons and their horses at ease, and with very short warning (to) make such provision for their diet as to him that is unacquainted withall may seem to be incredible.” (Holingshed’s Chronicle—Description of England.) And another observer (Fynes Moryson), writing before 1614, adds: “ If the traveler eats with the host or at the common table his meals cost him sixpence, and in some places *34 fourpence; but if he will eat in his chamber he commands what meat he will, and the kitchen is open to him to order the meat to be dressed as he likes best.” (The Itenerary, pp. 111-151.)
In the above-mentioned case of Thompson v. Lacy, the defendant kept a house in London called the Globe.Tavern and Coffee-house, where he furnished beds and provisions to those who applied. No stage, coaches or wagons stopped there, nor were there any stables belonging to the house. The question was whether this was an inn, and it was held that it was. “ The defendant does not charge,” said Best, J., “ as a mere lodging-house keeper by the week or month. * * * A lodging-house keeper, on the other hand, must make a contract with every man that comes, whereas an inn-keeper is bound, without making any special contract, to provide lodging and entertainment for all at a reasonable price.” In Doe v. Lansing (4 Camp., 76), decided before the above, Lord Ellenborough held that a coffee-house in London, where persons from the country lodged, was not an inn; and in an earlier case, (Parkhurst v. Foster, 1 Salk., 387), it was held that an establishment at a watering-place, where persons were taken to lodge, in which dressed meat was furnished to them at four pence per joint, and small beer at two pence per mug, and to whom stables were let to their horses, was not an inn. Neither of the cases are fully reported, and if maintainable, it must be upon the ground that these were not houses for the general reception of travelers, but places where either a lodging or certain' articles of food, or the stabling of a horse, could be procured by paying for each in contradistinction to the general entertainment which an inn supplied to all travelers or guests at a reasonable charge. In Dausey v. Richardson (2 Ellis & Bl., 144), it was held that a boarding-house was not an inn, the distinction being put upon the ground that a boarder being received into a house is owing purely to a voluntary contract, whereas an inn-keeper, in the absence of any reasonable or lawful excuse, is bound to receive the guest when he presents himself. ' “ The inn-keeper,” said Coleridge, J., in The King v. Ivens (7 C. & P., 213), “is not to select his guests. He has no right to say to one you shall come into my *35 inn, and to another you shall not, as every one coming and conducting himself in a proper manner has a right to be received inn-keepers, -he said, being a kind of public servants, having the privilege of entertaining travelers, and of supplying them with what they want. In Seward v. Seymour (Anthor's Law Student, 51), it was held that a well-known establishment which formerly existed in this city, callee), the Atlantic Hotel, had a double character, being both a boarding-house and an inn; that in respect to those who occupied rooms and were entertained under precise contracts, it was a boarding-house, while with respect to transient persons, who, without any stipulated contract, remained from day to day, it was an inn; and this definition of an inn was substantially given by Chief Justice Oakley in Wintermute v. Clarke (5 Sandf., 247), as a house ■“ where all who come are received as guests, Avithout any previous agreement as to the duration of their stay, or as to the terms of them entertainment.” In Willard v. Reinhard (2 E. D. Smith, 148), the-distinction between a boarding-house and an inn was declared to be this : in a boarding-house the guest is under an express contract at a certain rate for a certain period of time, but in an inn there is no express engagement, the guest being on his way is entertained from day to day, according to his business,' upon an implied contract. And in Carpenter v. Taylor (l Hilt., 195), it Avas held that a restaurant, to AAhich a person resorts for the temporary purpose of obtaining a meal, is not an inn. “ On the contrary,” said Ingraham, J.; “ as the customs.of society change and the modes of Irving are altered, the law as established, under different circumstances, must yield and be accommodated to such changes. Mere eating-houses cannot now be considered as inns. They are wanting in some of the requisites ■ necessary to constitute them' inns, as no lodging places are provided for travelers, and though the defendant may carry on in another part of his premises the business of an inn-keeper, it doe§ not follow that the liability for that part of the premises-is to be extended to the whole. To which it may be added, with equal force, that a mere lodging-house, in which no provision is made for supplying the lodgers with them meals, wants one of the -essential requisites of an inn.
*36 It follows from these authorities, that an inn is a house where all who conduct themselves properly, and who are able and ready to pay for their entertainment, are received, if there is accommodation for them, and who, without any stipulated engagement as to the duration of their stay, or as to the rate of compensation, are, while there, supplied at a reasonable charge with their meals, their lodging, and such services and attention as are necessarily incident to the use of the house, as a. temporary home. This, as accurately as I am able to state it, is the legal definition of an inn, and this is exactly what is understood in this country by a hotel. It is customary, especially in our cities, to let out furnished apartments' in houses, by the week or by the month, without meals, or with breakfast simply; but we do not, as the French do, call such houses hotels, but merely lodging-houses. (Worcester’s and Webster’s Dictionaries.) "We have in the cities houses of entertainment in which the guest or traveler pays so much per day for his room, and takes his meals or not, as he thinks proper, in the restaurant, paying separately for each meal as he takes it. Where the restaurant forms a part of the establishment, ‘and the house is kept under one general management for the reception of all travelers) or guests that may come, it is an inn, there being no material difference between it and the Elizabethan inn, in which the traveler paid separately for his apartment and for each meal. It differs 'from a bonding-house, for the reason that all who come are received, and because the guest engages for no specific period, but pays only for the time he is there.
In Smith v. Scott (9 Bing, 14; 2 Moo. & S., 35), it was held that a woman who kept a house without any public sign, in London, in which she let rooms to families or single men for long or short periods, and, if required, found cooked provisions for them, upon which she charged a small profit, receiving her orders usually every Monday and her payment at the.end of the week—the house being open at ah hours to any person' who came—was a hotel-keeper, within the meaning of the Bankrupt Act of 6 Geo. IV., ch. 16, §2, which enumerates “ victualers, keepers of inns, taverns, hotels and coffee-houses,” as among the classes of persons who may be declared bankrupt. 0. J. T1HD2VLL put the decision upon the ground that *37 some distinction must have been intended, as the word which immediately precedes hotel in the act is inn, and that it could scarcely have been intended to designate the same thing by both words. He was of'opinion that hotel was not used in the sense of the old word hostel, “for that,” he said, “means what is now termed an inn.” ■ “ The modem word,” he remarked, “ was introduced from the French, and rather implies a house to which people resort for lodging than for the sort of entertainment which is to be procured only at an inn;” and Gaselee J., said that there might' have been a doubt if the party had only received lodgers occasionally, but as the house was open to any comer, and all who frequented it were supplied with provisions to some extent, he regarded it as a hotel. It is sufficient to say in respect to this case'that it may be that in London the word hotel is not applied to an inn; that there it has undergone no change, but still is limited to the signification which it originally had when introduced there. Such is not, however, the case in this country, where the word has been long in popular use to designate what in the law is denominated an inn. • ■
I have discussed the meaning of this word closely, for the reason that it is an embarrassing question whether the building owndd by the plaintiff is, or is not, a hotel. As contradistinguished from a boarding-house, it is public in its character,. being open to all comers, and two of the principle wants supplied by an inn, lodging and meals, can be obtained there; but not under any general arrangement, as the' restaurant is kept by one person and the lodging-house by another. The proprietor of the restaurant does not engage to provide lodgings for those who come to his restaurant for entertainment, and the keeper of the lodging-house lets out his rooms for twenty-five cents a night, without any stipulation, express or implied, to furnish those who take them with meals. Each is independent of and has no control over the other, and neither in his separate capacity could be regarded as the keeper of an inn, hable to that extraordinary responsibility for the safe keeping of the property of guests, which the law imposes upon that class of bailees. If the cases to which I have reference (Parkhurst v. Lansing, 1 Salk, 387, and Doe v. Lansing 4 Camp, *38 76), were correctly determined, it is not an inn,- and in the best view I can take of it, though the point is not free from doubt, it is not that kind of house for the general-reception of travelers, which in this country is known as a hotel.
But though the uses to which the building is applied may ' not, in the legal or in the popular acceptation of the term, make it a hotel, it might still be deemed one in the sense of an ordinance regulating the rate to be paid for the supply of Croton water, if it were apparent that it was a kind of establishment for which the ordinance manifestly meant to provide. A huge lodging-house, supplied from roof to cellar, would consume as much water, and should be required, as well, to pay proportionally for the use of it, as a smaller building coming strictly within the definition of a hotel. The whole design of the ordinance was to regulate the tax according to the consumption, and for this purpose hotels and boarding-houses, in addition to the rate paid by private families, are to be charged for each lodging-room, and it is "left to the discretion of the Croton Aqueduct Board to determine what the charge per room shall be. There are 180 lodging-rooms in the plaintiff’s building, and the Board have imposed an annual tax of $180 or $1 for each room. It is but a just interpretation of the ordinance, however, to suppose that the design of it was that each lodging-room supplied with water in such an establishment, should be separately charged for, and not that a tax should be imposed where water cannot be' supplied. During one-half of the twenty-four hours, the Croton water does not rise beyond the basement of the plaintiff’s building, in consequence of the number of mechanical and other establishments in this particular locality, which, throughout the day, drain and greatly diminish the supply. Unable to procure by the ordinary flow of the aqueduct what is required for the lodging-rooms above the first-floor, the plaintiff, as already stated, has been compelled to build a tank to receive the ram water from the roof, obtaining by that means what could not be obtained from the supply of the" aqueduct. While, therefore, I am disposed to think that a large lodging-house, to which water is freely supplied, would come within the intention of the ordinance, I am of the opinion that the plaintiff’s build *39 ing does not. It is not strictly within' the words of the ordinance, as it is not what is popularly known as a hotel, and it is not such an establishment as could have been contemplated by it, as it is not to be supposed that there was an intention to tax a man for all the lodging-rooms of a building if water could not be supplied to them, and he is compelled to obtain it elsewhere. It is a case, in my judgment, coming under the portion of the ordinance which provides that matters not mentioned are to- be arranged by a special contract, and not under the one which imposes a charge upon each lodging-room. I shall, therefore, grant the injunction.